Westlaw.

Not Reported in F.Supp.2d                                                                                                          Page 1

Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
U.S. v. Weidner
D.Kan.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Kansas.
UNITED STATES OF AMERICA, Plaintiff,
v.
Clinton Odell WEIDNER, II, Defendant.
**No. 02-40140-01-JAR.**

March 4, 2004.

Elizabeth R. Herbert, Pedro L. Irigonegaray, Robert V. Eye, Irigonegaray & Associates, Topeka, KS, for Defendant.
Daniel E. Monnat, Monnat & Spurrier, Chartered, Wichita, KS, David B. Rosenbaum, Taylor C. Young, Osborn Maledon PA, Phoenix, AZ, Patrick Ross Miller, Ullman, DeZube & Miller, PA, Overland Park, KS, Mark J. McGivern, McGivern Realty, Inc., Topeka, KS, for Movant.
Richard L. Hathaway, Office of United States Attorney, Topeka, KS, Annette B. Gurney, Office of United States Attorney, Wichita, KS, for Plaintiff.

*CORRECTED ORDER MEMORIALIZING FEBRUARY 26, 2004 RULINGS AND FINAL ORDER OF FORFEITURE*
ROBINSON, J.
*1 On August 29, 2003, the Court entered a Preliminary Order of Forfeiture (Doc. 121), which ordered the defendant to forfeit to the United States "the real property identified in Exhibit A to the Superseding Indictment...." Thereafter, EagleRidge at Fountain Hills, LLC and Scottsdale Sierra EagleRidge, LLC filed third-party petitions asserting interests in the real property (Docs. 129 and 133). The government filed a Motion to Substitute Property (Doc. 136). Petitioners Scottsdale Sierra EagleRidge, LLC, Sierra Homes LLC, and John F. McGivern II filed a Joint Petition asserting third-party interests in the real estate as well as the purported substitute property (Doc. 158). Joint Petitioners subsequently moved for summary judgment on their third-party claims (Doc. 159). The government responded to Joint Petitioners' motion for summary judgment and moved for dismissal of their third-party claims (Doc. 167).

A hearing was held on February 26, 2004, at which time the Court made oral findings of fact and conclusions of law on the various motions. The following order memorializes those findings.[FN1]

FN1. This Order replaces the previous order entered on March 3, 2004 (Doc. 221), to correct a clerical error relative to several statutory citations. Specifically, all references to "18 U.S.C. § 853" have been corrected to reference "21 U.S.C. § 853". The substance of the order remains the same.

1. Background

As a result of the guilty verdicts on Counts 1, 2 and 5 of the Superseding Indictment and defendant Weidner's guilty plea to Counts 3 and 4 of the Superseding Indictment, the government sought forfeiture pursuant to 18 U.S.C. § 982. An evidentiary hearing was conducted on the forfeiture allegations in Count 7.[FN2] The forfeiture hearing focused on the subject real property. The parties stipulated that the legal description in Exhibit A to the indictment was the legal description of the subject real property and that it was obtained by virtue of the $1.5 million down payment. The jury found that the government established a requisite nexus between Weidner's interest in the real estate and the offense, but not the $1.5 million. The jury was not asked to find the requisite nexus existed between the offense and Weidner's 50% interest in the Scottsdale LLC, nor was it asked about any substitute property.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

FN2. Count 7 of the First Superseding Indictment sought forfeiture of:
a. any property, real and personal, involved in violation of Title 18, United States Code, Section 1957, as alleged in Count 6, and all property traceable to such property; and
b. any property, real or personal, constituting and derived from proceeds the defendants obtained directly and indirectly as the result of the violations of Title 18, United States Code, Sections 371 and 1005, as alleged in Counts 1 through 5, including, but not limited to:
....
2) Real Property listed in Exhibit A, attached hereto and incorporated herein by reference.

The Court entered an Order of Preliminary Forfeiture, pursuant to Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, on the government's motion (Doc. 121). This order essentially recognized the jury verdict and ordered forfeited the real property. Weidner filed a Motion to Amend the Preliminary Order of Forfeiture (Doc. 122), which the Court denied (Doc. 126), stating Weidner's argument regarding the extent of his interest in the real estate was premature and not his to make. The order cited Rule 32.2, Advisory Committee Notes, 2000 Adoption, stating that the defendant has no standing to object to the forfeiture on the ground that the property belongs to someone else. Pursuant to Fed.R.Crim.P. 32.2, the court orders the forfeiture of the defendant's interest in the property whatever that interest may be-in the criminal case. At that point, the court conducts a separate proceeding in which all potential third party claimants are given an opportunity to challenge the forfeiture by asserting a superior interest in the property. This ancillary proceeding does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property.[FN3] Rule 32.2(c) requires deferral of a determination of interests until any third party files a claim in an ancillary proceeding under this rule. Thus, the Preliminary Order did not determine the extent of Weidner's interest in the property.

FN3. Fed.R.Crim..P. 32.2; 2000 Advisory Committee Notes.

*2 Thereafter, Scottsdale Sierra EagleRidge LLC and EagleRidge at Fountain Hills, LLC filed third-party petitions asserting interests in the real property (Docs. 133 and 129, respectively).

The government then moved for an order substituting the proceeds of the Escrow Agreement entered into post-indictment between Scottsdale LLC and the United States for the real property that is the subject of the preliminary order (Doc. 136). Defendant Weidner objected to the motion to substitute property (Doc. 139), which the government has moved to strike (Doc. 148).

Petitioners Scottsdale Sierra EagleRidge LLC, Sierra Homes LLC, and John F. McGivern II filed a joint petition asserting third-party interests in the real estate as well as the purported substitute property, the proceeds of the escrow account between Scottsdale and the government.

2. Facts

Very few facts are in dispute. Defendant Weidner utilized $1.5 million as a capital contribution to obtain a 50% ownership interest in Scottsdale Sierra Eagleridge, LLC ("Scottsdale"). The $1.5 million was obtained by Weidner through an illegal loan from codefendant Wittig. Scottsdale is an LLC currently in good standing and organized under the laws of Arizona. Weidner and Michael Earl are both 50% owners of Scottsdale; Earl is the managing member.

Scottsdale is engaged in the business of purchasing and developing real estate. Scottsdale used the illegally obtained $1.5 million as a partial down payment on real property that has become the subject of this forfeiture action. Scottsdale purchased 21 lots located in Arizona (the "Eagleridge Lots") from EagleRidge at Fountain Hill, LLC ("Fountain Hills"). Three of these lots

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cr-00170-WHA-CSC   Document 456-2   Filed 06/22/2007   Page 4 of 9

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
(Cite as: Not Reported in F.Supp.2d)

were "released" to Scottsdale.

Scottsdale and Earl were later contacted by Weidner concerning the funds contributed by Weidner. Weidner stated he had borrowed the $1.5 million from a friend, indicated that there was a problem with Capital City Bank and the mechanics of how the funds were transferred, and that he needed to return the funds. Weidner approached a long-time bank customer, John F. McGivern, II regarding a loan to repay Wittig's loan at Capital City Bank. McGivern's loan proceeds were transferred to a Sierra Homes account controlled by Earl, who directed a wire transfer to be made to the benefit of Wittig at Capital City Bank. Wittig wrote a check from this account to pay down his line of credit. Earl admitted during his grand jury testimony that he knew that the McGivern loan was going to be used to repay Wittig. Scottsdale negotiated the loan from McGivern, and both Earl and Weidner provided personal guarantees to the McGivern loan. As security for the loan, McGivern took a security interest in two of the EagleRidge lots, Lots 12 and 65. McGivern has never established a claim or interest in Weidner's 50% interest in Scottsdale.

Through the course of developing and selling lots, Scottsdale found itself in conflict with Fountain Hills concerning the Eagleridge Lots. Fountain Hills foreclosed on and reacquired the 18 lots purchased by Scottsdale through a trustee's sale. To resolve their differences, the parties entered into a settlement agreement concerning the disposition of the property. Fountain Hills retained title to the 18 Fountain Hills lots and Scottsdale retained title to its three lots. Proceeds from the sale of all lots are divided between Fountain Hills and Scottsdale according to a formula set out in the Settlement Agreement.

*3 Prior to trial, the government filed a lis pendens on the property. The Settlement Agreement between Scottsdale and Fountain Hills was contingent upon Scottsdale securing a release of the government's lis pendens against the 21 lots, and securing a release of all claims by the government to any interest in the real property or Fountain Hill's proceeds. Accordingly, Scottsdale negotiated the April 11, 2003 Escrow Agreement with the government for Fountain Hill's benefit. Under the terms of the Escrow Agreement, the government released any interest it had in the real property of the EagleRidge Lots and agreed that "the interests of the United States arising out of the [Weidner criminal litigation] shall attach only to proceeds from such EagleRidge Lot sales as are payable to [Scottsdale] pursuant to the [Scottsdale/Fountain Hills] Settlement Agreement." Fountain Hills began and continues to sell Fountain Hills lots to third parties. Proceeds from these sales have been distributed between Fountain Hills and Scottsdale pursuant to the terms of the Settlement Agreement.

The Escrow Agreement entered into by Scottsdale and the government provides that the funds payable to Scottsdale pursuant to the terms of the Settlement Agreement between Scottsdale and Fountain Hills up to $1.5 million, would be placed into an escrow account, and that the interest of the United States in the real property arising out of this criminal case would attach to these proceeds. The agreement related to two (2) EagleRidge lots, 12 and 65. The government released its lis pendens from the lots, and all funds payable to Sierra upon the sale of the lots up to $1.5 million were deposited into the escrow account. These funds are net of expenses and liens. The escrow agent was authorized to disburse amounts necessary to pay installment payments due on the McGivern Loan, in the principal amount of $1.5 million, secured by Deeds of Trust on Lots 12 and 65. Scottsdale disputed the government's interest in the proceeds. McGivern's security interest in these two lots have been released and the lots have been sold.

3. Motion to Substitute Property

The government has moved for an order substituting the proceeds of the Escrow Agreement entered into post-indictment between Scottsdale LLC and the United States for the real property that is the subject of the preliminary order (Doc. 136). The government states in its response to Petitioners' motion for summary judgment that this motion to substitute was "the government's effort to tailor the Preliminary Forfeiture order consistent with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 4
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

Special Verdict of the Jury, and accordingly, was probably mistitled."

Pursuant to 21 U.S.C. § 853(p), the government may, in certain circumstances, seek forfeiture of substitute assets. Under that section, the government must establish that due to an act or omission of defendant, the forfeited property:
1) cannot be located;
2) has been transferred or sold to, or deposited with, a third party;
*4 3) has been placed beyond the jurisdiction of the court;
4) has been substantially diminished in value; or
5) has been commingled with other property.

The parties do not disagree, that if there is forfeitable property, substitute property may be forfeited, as a general proposition. However, the Petitioners argue that the government cannot pursue substitute property in this case for several reasons. Although the Court questions Petitioners' standing to raise such objections, it will address their claims. First, since the jury specifically refused to render a verdict forfeiting $1.5 million in cash, the government is foreclosed from seeking forfeiture of cash proceeds of the real property. But, the verdict form merely indicated $1.5 million in cash, not this sum in cash proceeds. Thus, the jury's decision to not allow forfeiture of $1.5 million in cash cannot be viewed as an express rejection of forfeiture of proceeds of the real estate.

Petitioners secondly argue that the government waived any claim of forfeiture of funds in an escrow account (that are the proceeds of the sale of 2 lots) because this escrow account was created before the trial in this case, and the government should have asked for forfeiture of the escrow account itself, as it was identifiable proceeds of the real property long before the jury was instructed and given a special verdict form. The government's response is that it is disingenuous of the petitioners to claim the government waived its rights to funds in the escrow account, when the escrow account was created to resolve any dispute between the government and Fountain Hills, and allow for the sale of the real estate and the deposit of the proceeds preserving the government's interest in Weidner's share subject to further order of the court. The Court agrees with the government on this. Further, Fed.R.Crim.P. 32.2(e)(1) makes clear that the right to a bifurcated jury trial to determine whether the government has established the requisite nexus between the property and the offense does not apply to the forfeiture of substitute assets. It is well established in the case law that the forfeiture of substitute assets is solely an issue for the court.

Petitioners further argue that, to obtain forfeiture of the escrow account as substitute property, the government must show, pursuant to 21 U.S.C § 853(p), that the escrow account was created "due to an act or omission by the defendant;" but this escrow account was created by virtue of an agreement between the government and Scottsdale LLC and others. Again the creation of the escrow account is a red herring, and does not govern the Court's determination of whether the government is entitled to pursue substitute property. All actions of Scottsdale LLC must be approved and executed by a majority-in-interest of the members, and Weidner would have approved the creation of the escrow account by the dictates of the Operating Agreement of the LLC. In order to obtain substitute property, the government must establish that the forfeited property cannot be located upon the exercise of due diligence, has been transferred/sold/deposited with a third party, has been placed beyond the jurisdiction of the court, and/or has been substantially diminished in value. Given that the real property has been sold and the proceeds placed in escrow, the Court concludes that the government easily establishes these additional requisites triggering a right to substitute forfeited property.

*5 Defendant Weidner has also objected to the motion to substitute property (Doc. 139), which the government has moved to strike (Doc. 148). Defendant continues to assert that he has no ownership interest in the real estate and thus, none in the proceeds. As previously discussed, Defendant has no standing with respect to this ancillary proceeding, and cannot contest forfeiture on the grounds that the subject property is owned by a third party.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 5
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

Accordingly, the Court grants the government's motion to substitute property.

### 4. Ancillary hearing/Third party claims to forfeited property

As previously stated, once the court enters a Preliminary Order of forfeiture directing the forfeiture of whatever interest the defendant has in the forfeited property, the government may seize the property and commence an ancillary proceeding to determine the interests of any third party. Thus, the ancillary proceeding has become the forum for determining the extent of the defendant's forfeitable interest in the property. This allows the court to conduct a proceeding in which all third party claimants can participate and which ensures that the property forfeited actually belongs to the defendant.[FN4]

FN4. *Id.*

Congress has afforded two narrow categories of third parties standing to petition the courts to determine the validity of their claims to forfeited assets:

1) where the petitioner had a legal interest in the property that, at the time of the commission of the acts giving rise to the forfeiture, was vested in him rather than the defendant or was superior to the interest of the defendant ("antecedent interest");[FN5] or

FN5. 21 U.S.C. § 853(n)(6)(A).

2) where the petitioner acquired his legal interest after the acts giving rise to the forfeiture but did so in the context of a bona fide purchase for value and had no reason to believe that the property was subject to forfeiture ("BFP").[FN6]

FN6. 21 U.S.C. § 853(n)(6)(B).

The petitioner has the burden of proof and must establish his respective interest by a preponderance of the evidence. In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portion of the record of the criminal case, which resulted in the order of forfeiture. If the petitioner does not establish one of these legal interests, petitioning the Attorney General for remission and mitigation remains the exclusive remedy.

When it is clear from a third-party claimant's petition that he cannot, as a matter of law, prevail as an antecedent owner or BFP, the court may dismiss the petition for lack of standing without conducting a hearing on that claim.

Thus, the government is correct when it states that the only issues to be determined today at this ancillary hearing are: 1) the extent of defendant Weidner's interest in the real property/proceeds in the escrow account and 2) whether that interest is affected by the interests of Petitioners, i.e., are they parties whose interests in the property antedated the crime, or are they bona fide purchasers reasonably without notice that the property is forfeitable.

### A. Extent of Weidner's interest in real estate/proceeds in escrow account

**\*6** Weidner does not own the subject real property. Instead, he has an indirect interest in the real property derived from his fifty percent (50%) ownership of Scottsdale Sierra Ridge, LLC, which in turn was the owner of the subject real property. The property has since been sold, or is in the process of being sold, and the proceeds payable to Scottsdale pursuant to the terms of the Settlement Agreement between Scottsdale and Fountain Hills, up to $1.5 million, have been placed in an escrow account.

The Scottsdale LLC Operating Agreement dated April 15, 2001, as modified to include Weidner, is part of the record. Income and losses are allocated in accordance with member percentage interests. Weidner holds a 50% interest; Michael Earl holds the other 50% interest. Greatly summarized, the Operating Agreement provides that proceeds from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

liquidation of assets (whether or not in conjunction with dissolution of the LLC) shall be applied in the following order:
1. To creditors of the LLC in order of priority as provided by law;
2. to reasonable reserves determined by members necessary for contingent or unforeseen liabilities;
3. to members in proportion to and to the extent of the positive balances in the Capital Accounts;
4. to members in accordance with their respective percentage interests.

Thus, the Court concludes that defendant Weidner has an interest in the real estate and the proceeds from the sale of the real estate placed in the escrow account derived from his 50% ownership interest in Scottsdale and the concomitant distribution rights pursuant to the Operating Agreement and Arizona law. However, the amount of Weidner's distribution remains to be seen, and will ultimately be determined by the Operating Agreement and Arizona law.

B. Petitioners' interests

1) EagleRidge at Fountain Hills, LLC (Fountain Hills)

Fountain Hills, as a BFP, asserts an unopposed interest, and seeks an amendment to the Preliminary Order of Forfeiture to reflect that 1) the United States has no (and claims no) title to the real property itself reflected in the Preliminary Order of Forfeiture (the EagleRidge Lots); and 2) the United States has no (and claims no) right to receive Fountain Hills' proceeds from the sales of the EagleRidge lots. Fountain Hills and the government have stipulated as to the affidavit of Erik Eriksson, and no testimony was offered at the hearing.

2) Joint Petitioners

The Court will address each of the joint petitioners' claims:

a) Scottsdale Sierra EagleRidge, LLC (Scottsdale)

Scottsdale asserts that it is the owner of the real estate, not Weidner. There is no dispute that Scottsdale was the original owner of the real estate. However, it was not an antecedent owner, since it purchased the real estate from Fountain Hills subsequent to the act giving rise to the forfeiture. In other words, because Scottsdale purchased the real estate with the $1.5 million funds illegally acquired by Weidner, its interest was not vested or superior to Weidner's at the time of the criminal act, as required by 21 U.S.C. § 853(n)(6).

*7 Moreover, Scottsdale's ownership of the real estate is not a superior interest that would prohibit forefeiture of Weidner's interest in the real estate derived from his membership in Scottsdale. The interests are different-even though Scottsdale may have ownership interest in the property, proceeds from liquidation of the LLC's assets may still be distributed to members pursuant to the operating agreement. Scottsdale has received, and may continue to receive, proceeds from the settlement agreement with Fountain Hills. To date, Weidner still retains his 50% ownership interest in the LLC, as does Michael Earl.

To the extent Scottsdale may contend that it is a BFP, it does not appear that it qualifies under the definition contemplated by the forfeiture statutes. Scottsdale did not acquire title to the real estate from Weidner; it purchased it from Fountain Hills with funds contributed by Weidner to it, the LLC. Weidner knew when he made the capital contribution that it would be used as a down payment for the property. This is hardly the arms-length transaction between Weidner and Scottsdale, whereby Scottsdale gave Weidner value with equivalent value in return.

b) John McGivern, II

McGivern also contends that he is a BFP, as a secured lender holding Deeds of Trust on Lots 12 and 65. This issue appears to be moot, however, as the lots have been sold and his liens have been released. Proceeds from the sale of the lots have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                      Page 7
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d)**

been applied to satisfy loans and expenses as provided in paragraph 7 of the escrow agreement, which specifically includes McGivern's loan. There is no evidence that McGivern retained a security interest in other proceeds. Thus, McGivern is merely a general unsecured creditor of Scottsdale LLC for the balance of his $1.5 million loan, and as such, cannot be a BFP. Thus, although McGivern's unsecured balance owed by Scottsdale may ultimately have an impact on what Weidner may receive as proceeds via his 50% distribution interest, it is not the type of legal interest that would keep the forfeiture from proceeding. This would also be the case if he was a secured creditor. Moreover, McGivern has never claimed nor established that he bought out or was assigned Weidner's 50% interest in the Scottsdale LLC when he extended the $1.5 million.

Although not dispositive, the Court further notes that the circumstances surrounding the $1.5 million dollar loan preclude McGivern from claiming BFP status. Title 21 U.S.C. § 853(n)(6) requires a BFP to be reasonably without notice that the property was subject to forfeiture. McGivern knew that Weidner was no longer at Capital City Bank and that he wanted out of the deal because there was a problem at the bank. On more than one occasion, he asked Weidner if there was anything illegal about the transaction, but did not inquire beyond that. As with Scottsdale, this is hardly the arms-length transaction inherent to BFP status.

c) Sierra Homes

Petitioners state that Sierra Homes is an Arizona LLC that holds an interest in the property and that Sierra Homes has "compensated McGivern for a portion of the debt owed by Scottsdale, as evidenced in the promissory note." However, there is nothing in the record that indicates what interest Sierra Homes has in the property; the compensation to McGivern appears to be repayment of the $1.5 million loan along with Scottsdale.

*8 In sum, it is clear from the Joint Petition and the vast amount of documentary evidence that Scottsdale, McGivern and Sierra have failed to establish that they were antecedent owners or BFP's of the forfeited property. Nor do they establish an interest of any kind relative to Weidner's interest in the proceeds from the sale of real estate derived from his 50% ownership of the Scottsdale LLC and concomitant distribution rights. Thus, Petitioners lack standing to challenge the forfeiture of defendant's interest in the proceeds from the real estate or the substitute forfeited property, the proceeds in the escrow account, and accordingly, the Court will grant the government's motion to dismiss their claims to this property.

5. Validity of the verdict

Petitioners Scottsdale, McGivern and Sierra also contest the validity of the jury's special verdict finding that Weidner's interest in the real estate was subject to forfeiture. As the government points out, the Advisory Comments to the 2000 amendments to Rule 32.2 state that this ancillary proceeding does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property.[FN7] Further, as previously ruled, Joint Petitioners do not have standing to contest the forfeiture.

FN7. F.R.C.P. 32.2; 2000 Advisory Committee Notes.

Lack of standing aside, the Court will address Petitioners' claims. Petitioners first argue that the real property "is not involved in or traceable to Weidner's offenses." The Court disagrees. Weidner's interest in the real property is clearly traceable to the fraudulently obtained $1.5 million used by Scottsdale LLC as a capital contribution to fund the property.

Petitioners also contend that the jury instruction and verdict form are too limiting, such that the verdict of forfeiture must be vacated. The distinction between *in rem* and *in personam* forfeiture sheds some light on this issue. Criminal forfeiture is *in personam*. In other words, it is a form of punishment imposed by the jury to divest the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

criminal defendant of the profits of the illegal activity for which he has been convicted.[FN8] Because it seeks to penalize the defendant for his illegal activities, *in personam* forfeiture reaches only the interest that the criminal defendant held in the property. [FN9] In other words, the property itself is not forfeited; rather, defendant's interest in the property is forfeited.

FN8. *U.S. v. Gilbert,* 244 F.3d 888, 918 (11th Cir.2001).

FN9. *Id.* (citation omitted).

Petitioners argue that the government improperly submitted a verdict director to the jury requesting forfeiture of the real property. The record indicates otherwise. In this case, the government sought forfeiture of Weidner's interest in the real estate as property involved in or traceable to laundered money, or derived from proceeds defendant obtained directly or indirectly as the result of the false bank entry violation. At the forfeiture hearing in this case, the jury was presented with specifics about Weidner's interest in the Scottsdale LLC and the distributions he was to receive as a result as set forth in the Operating Agreement. The instruction and verdict form made it clear that the jury was only being requested to forfeit Weidner's interest in the real estate.

*9 The Court finds that the verdict form sufficiently states that it is Weidner's "interest in" the property that is being sought for forfeiture. The jury rendering a verdict of no forfeiture of Weidner's interest in $1.5 million in cash, does not necessarily foreclose forfeiture of proceeds of assets owned by an LLC in which he has an interest. The jury did not specifically reject forfeiture of proceeds of Weidner's interest in the property.

IT IS THEREFORE ORDERED BY THE COURT THAT:
1) The government's motion to substitute property (Doc. 136) is GRANTED;
2) Petitioner Fountain Hill's Petition asserting third party claim (Doc. 129) is GRANTED;
3) Joint Petitioners' Scottsdale, Sierra Homes and McGivern's motion for Summary Judgment (Doc. 159) is DENIED and their Joint Petition (Doc. 158) is dismissed for lack of standing.
4) In accordance with the foregoing, and pursuant to Fed.R.Crim.P. 32.2(c)(2) and (e)(2), the Preliminary Order of Forfeiture is amended as follows:
a. The defendant shall forfeit to the United States his interest in the proceeds of an escrow agreement entered into between the United States and Scottsdale Sierra Eagleridge, LLC, on April 11, 2003;
b. Defendant's interest in said proceeds is derived from his distribution rights stemming from his 50% ownership interest in Scottsdale Sierra Eagleridge, LLC, as determined by the Operating Agreement and/or Arizona law;
c. The United States has no (and claims no) title to the real property itself identified in the Preliminary Order of Forfeiture (the "EagleRidge Lots"); and
d. The United States has no (and claims no) right to receive Fountain Hills' proceeds from sales of the EagleRidge Lots.
5) This Final Order of Forfeiture is and shall be made part of the sentence and included in the judgment.

IT IS SO ORDERED.

D.Kan.,2004.
U.S. v. Weidner
Not Reported in F.Supp.2d, 2004 WL 432251 (D.Kan.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.